UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH W. MORRISON, as
Personal Representative of the
Estate of Mark T. Lowe,

        Plaintiff,

v.

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

        Defendant.

_____/

CIVIL ACTION NO. 09-11948

DISTRICT JUDGE NANCY G. EDMUNDS

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

I recommend that Plaintiff's Motion for Summary Judgment be denied, and that Defendant's Motion for Summary Judgment be granted.

### II.    REPORT

#### A.    Procedural History

This is an action for judicial review of an ERISA Plan Administrator's decision denying Plaintiff's claim for insurance benefits on behalf of a deceased Plan participant. The Complaint was filed on May 21, 2009. Defendant filed its Answer on July 1, 2009. The court entered a Scheduling Order which directed the parties to file any statements of procedural challenge by August 10, 2009, and cross motions for summary judgment within sixty (60) days thereafter. On August 6, 2009, Plaintiff filed a Statement of No Procedural Challenge. Defendant filed a Statement of No Procedural Challenge on August 10, 2009.

On August 20, 2009, the court entered a Stipulated Order allowing the filing of the administrative record under seal. On October 8, 2009, the parties stipulated to an extension of the dispositive motion filing date. Defendant's Motion for Summary Judgment was filed on November 9, 2009, and Plaintiff's Motion for Summary Judgment was filed on the following day.  The dispositive motions were referred to the magistrate judge on November 13, 2009.  The motions were heard on December 30, 2009.  Following the hearing, Plaintiff filed a Motion to Permit Discovery regarding the controlling standard of review. That motion was referred to the magistrate judge on January 11, 2010, and brought on for hearing on February 4, 2010. On March 15, 2010, the motion was denied. No objection to that decision was filed. On May 17, 2010, Plaintiff filed a Motion to Amend Scheduling Order and For Leave to File Supplemental Brief. Defendant filed a Brief in Opposition on May 28, 2010. The parties appeared for hearing on June 8, 2010, and the Motion was denied in a written Order on June 14, 2010.

### B.    Applicable Law and Standard of Review

The Scheduling Order entered by the district court judge on July 8, 2009 provides that these proceedings will be conducted in accordance with the guidelines set forth by the Sixth Circuit Court of Appeals in Wilkens v. Baptist Health Care System, Inc., 150 F.3d 609, 619 (6th Cir. 1998). That decision recognized the determination of the Supreme Court, in Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989), that the standard of review for an ERISA plan administrator's denial of benefits is de novo, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Wilkens, 150 F.3d at 613. Where the benefit plan gives such discretion to the plan administrator, "the highly deferential arbitrary and capricious

standard of review is appropriate . . .." <u>Yeager v. Reliance Standard Life Ins. Co.</u>, 88 F.3d 376, 380 (6th Cir. 1996). Under either standard, the court's review is confined to the record that was before the plan administrator. <u>Miller v. Metropolitan Ins. Co.</u>, 925 F.2d 979, 986 (6th Cir. 1991).

**C.** **Factual History**

Plaintiff's decedent, Mark T. Lowe ("Lowe"), was killed in a motor vehicle accident on September 8, 2006. He was the father of Harlie Lowe, a minor child, who is the sole beneficiary of his estate. At the time of his death, Lowe was a full-time employee of PlastiPak, a division of Absopure Water Company ("Absopure"), in Westland, Michigan. He had been so employed since April 25, 2005. On January 1, 2006, Absopure implemented a plan with Unum Life Insurance Company of America ("Unum") to provide life insurance and accidental death and dismemberment benefits to its employees, including Lowe. Plan participants were divided into four eligibility groups, only two of which are relevant to this case. Group 1 included all full-time employees with basic annual earnings of less than $30,000.00 in active employment. Eligibility Group 2 included those employees earning "at least $30,000.00 but less than $40,000.00." (See Unum Plan, UACL 00027-00038, 00041-00042.) Group 1 members qualified for $30,000.00 in life insurance and $60,000.00 in accidental death/dismemberment benefits. Group 2 employees were eligible for $90,000.00 in life insurance and $180,000.00 in accidental death/dismemberment benefits. (UACL 00038-00042.)

The insurance policy (p. ERISA-7) contains the following language:

**DISCRETIONARY ACTS**

In exercising its discretionary powers under the Plan, the Plan Administrator and any designee (which shall include Unum as

3

> a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan. Benefits under the Plan will be paid only if the Plan Administrator or its designee (including Unum) decides in its discretion that the applicant is entitled to them.

On June 12, 2006, Lowe was promoted to the position of Team Leader, and his salary increased to $1,150.00 paid biweekly. He also participated in a company sponsored health savings account (HSA). He elected an option under which he contributed $10.00 biweekly to the account, and the employer made biweekly contributions of $12.50. (UACL 00479.) Decedent's last pay stub reflected that the employer had contributed $225.00 to the HSA in 2006. (UACL 00410.)

On November 30, 2006, decedent's employer filed a notice of claim with Defendant Unum, stating that Lowe's salary was $1,150.00 biweekly. On February 16, 2007, Unum paid the Group 1 basic life insurance benefit, but denied the accidental death/dismemberment ("ADD") benefit. The estate did not dispute the life insurance award, but it appealed the ADD denial. Unum allowed the appeal and subsequently did pay the ADD benefit, as well as seat belt/air bag enhancement benefits, in November 2007.

On July 31, 2008, the estate asserted that the decedent qualified for Group 2 benefits because the Plan had improperly calculated his "annual earnings," and because the HSA benefits paid by PlastiPak raised his income above the $30,000.00 Group 2 threshold. Unum accepted and investigated the claim, but denied benefits. This lawsuit followed.

### D.  Analysis

Notwithstanding the insurance policy provisions granting to the Plan Administrator "the broadest discretion permissible under ERISA and any other applicable laws," Plaintiff

4

argues that this court should apply a *de novo* standard of review.  The argument is based

upon Michigan Office of Insurance Services ("OFIS") regulations which became effective

June 1, 2007.  The regulations state, in pertinent part, as follows:

> (c) On and after the first day of the month following the effective date of these rules, a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, endorsement, certificate, or similar contract document is void and of no effect.  This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.
>
> *          *          *
>
> (c) "Discretionary clause" is a provision in a form that purports to bind the claimant to or grant deference in subsequent proceedings to the insurer's decision, denial or interpretation on terms, coverage or eligibility for benefits including, but not limited to, a form provision that does any of the following:
>
> *          *          *
>
> > (vi) Provides that or gives rise to a standard of review on appeal that gives deference to the original claimed decision.
> >
> > (vii) Provides that or gives rise to a standard of review on appeal other than *de novo* review.

The insurance contract provided for annual renewals.  Plaintiff maintains that any

revision of its terms as a result of renewals after the July 1, 2007 nullification date of the

OFIS regulation would serve to invalidate the discretionary clause of the policy as to the

claim based on Lowe's death in 2006.

Plaintiff responds that the OFIS Regulations are inapplicable to the contract at issue

in this case because: (a) the policy governing Plaintiff's claim became effective January 1,

2006, and appears in the record without amendment; (b) the policy was issued, signed and

delivered by Unum to Absopure in the State of Maine, and provides that the governing jurisdiction is Maine; and (c) the death of Mark Lowe, which forms the basis of Plaintiff's claim under the policy, occurred in September 2006, ten (10) months before the OFIS Regulation became effective.

I am persuaded that the law is with the Defendant and against the Plaintiff on this issue. The contract provides that Maine law should govern any disputes. As a general proposition, the law of the State chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue. Restatement of Conflicts 2d, Section 187.

Plaintiff offers Howting-Robinson Associates, Inc. v. Bryan Custom Plastics, 65 F.Supp. 2nd 610 (E.D. Mich. 1999) as authority for this court to override the parties choice of Maine law to govern their relationship. In that case, this court correctly observed that federal courts sitting in diversity must apply the choice of law principles of the forum. Klaxon Co. v. Stentor Electric Manufacturing Company, 313 U.S. 487 (1941). The Michigan Supreme Court has held that, when determining the applicable law, courts must balance the expectations of the parties with the interests of the states. Chrysler Corp. v. Skyline Industrial Services, Inc., 448 Michigan 113 (1995). Michigan has adopted the approach set out in 1 Restatement of Conflict Laws Sections 187, 188 to resolve choice of law issues.

> Section 187(1) permits the application of the parties "choice of law if the issue is one that the parties could have resolved by an express contractual provision. However, there are two exceptions. The parties' choice of law will not be followed if (1) the chosen state has *no substantial relationship* to the parties

6

or the transaction, or (2) there is no reasonable basis for choosing that state's law. Section 187(2)(a). Also, Section 187(2)(b) bars the application of the chosen state's law when it 'be contrary to the fundamental policy of a state' which has a materially greater interest than the chosen state in the determination of the particular issue, and which, under the Rule of Section 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

Howting-Robinson, 65 F.Supp. at 612-13 (quoting Martino v. Cottman Transmission Systems, Inc., 218 Mich.App. 54 (1996).

Under Section 188 of 1 Restatement (2nd) of Conflict Laws, the court must look to the following factors to determine which state's law is applicable: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, . . . place of incorporation and place of business of the parties.

Id. at 213.

Judge Taylor found in Howting-Robinson that Michigan law applied, despite the contractual provision designating the law of Ohio as controlling. Because the only Section 188 factor in support of that designation was the fact that the defendant was incorporated there, she determined that Ohio had "a far less substantial relationship to the contract." She further found that the application of Ohio law would abrogate a "fundamental policy of Michigan law," because Michigan had a statute designed to protect sales representatives, and Ohio did not.

As to the first ground, it should be noted that the ruling in Howting-Robinson significantly lowered the Restatement Section 187(1) standard from *no substantial relationship* to a comparative standard of "far less substantial relationship" between the parties or the transaction and the contractually selected legal jurisdiction than with the state

of the forum court. That watered down standard finds no support in the authority cited in the decision.

In the case at bar, not only is Maine the state of domicile for Defendant Unum, the contract documents were signed by Unum at Portland, Maine and delivered to Absopure in that state. It would be difficult to conclude that the State of Maine has *no substantial relationship* to the parties or the transaction establishing the insurance coverage. Unum provides insurance to customers nationwide. Its interest in having its legal obligations determined by the single standard of the law of its home state is patent. In light of that interest, it would be absurd as well to conclude that there is "no reasonable basis" for choosing that state's law. While it might be argued that, by reason of Absopure's extensive operations in Michigan, Maine has a "far less substantial relationship" to the parties or the contract than Michigan, that is <u>not</u> the standard established by Section 187(1), and adopted by the Michigan Supreme Court. The correct standard has certainly been met here.

The second ground relied upon by the court in <u>Howting-Robinson</u> is also inapplicable here. Michigan's OFIS regulations did not take effect (or even exist) until long after Lowe's death, Plaintiff's claim and Unum's determination that the decedent was a Group 1 employee. The regulation, by its express language, was to have no application to previously existing contracts containing a discretionary clause. Even after subsequent amendment of the contract, the regulation would apply only prospectively. Accordingly, neither Maine nor Michigan has been shown to have had a "fundamental policy" against discretionary clauses in contracts created and fulfilled prior to the effective date of the OFIS regulations.

Finally, I would note that OFIS itself appears to have accepted Defendant's view that the law of the State of Maine governs the relationship of the parties to the contract in issue here. In a letter of December 3, 2009, in response to Plaintiff's counsel's inquiry, an OFIS representative noted Defendant's position, declared that the Michigan Office of Financial and Insurance Regulation was unable to review the matter further because it was already in litigation, and suggested that Plaintiff address any additional concerns regarding the handling of the matter to the Bureau of Insurance of the State of Maine. (See Docket Entry 27, Exhibit 2). To the extent that state regulations are not preempted by the ERISA statute, Plaintiff has offered no persuasive authority for the proposition that Michigan law should be applied where the Plan provides otherwise. There is no evidence in the record to suggest that discretionary clauses are not valid under the standards of Maine law.

Further, I am persuaded that, even if Michigan law were to be applied, the death of Mr. Lowe fixed the legal relationship of the parties under the policy of insurance, such that the subsequent enactment of the OFIS Regulations invalidating discretionary clauses would have no effect upon the dispute in this case. Under both Michigan and federal law, statutes that affect substantial rights in respect to transactions or occurrences already past, are not applied retroactively. See People v. Conyor, 281 Mich.App. 526; 762 N.W. 2nd 198 (Mich.App. 2008); Thaqui v. Jenifer, 377 F.3d 500 (6th Cir. 2004). Plaintiff's reading of the regulation, while not technically inconsistent with the language employed, is inconsistent with its most logical intent. I am satisfied that the intended purpose of the Regulation was to invalidate discretionary clauses in contracts which existed prior to its effective date, but only from and after any revision occurring on or after July 1, 2007. The rights of the parties to this action should be determined by the state of the law at the time of the event triggering

the entitlement to benefits. That event was the death of Mark Lowe on September 8, 2006, ten months before the regulation existed. The administrator's determination that Lowe was a Group 1 employee was made no later than February 16, 2007, on which date the basic life insurance benefit was paid. The OFIS regulation had still not yet become effective. The administrator's exercise of discretion was fully lawful when made, and to withdraw that discretion retroactively is unfair. The language of the regulation upon which Plaintiff relies does not compel a contrary result.[1] Indeed, its very terms express the intent to avoid retroactive application. The highly deferential arbitrary and capricious standard of review must be applied in this case.

A Plan Administrator's eligibility determinations are not arbitrary and capricious if they are "rational in light of the plan's provisions." Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380-81 (6th Cir. 1996). Where a plan grants an Administrator discretionary authority to determine eligibility for benefits, or to construe the terms of a plan, courts grant "great leeway" in the review of such decisions." Moos v. Square D Co., 72 F.3d 39, 42 (6th Cir. 1995). Where a decision is rational, a court may not second guess the administrator. Wages v. Sandler O'Neal and Partners, L.P., 39 Fed.App. 108, 112-13 (6th Cir. 2002). "Thus, the standard requires that the decision 'be upheld if it is the result of a deliberate, principled reasoning process, and if it is supported by substantial evidence.'" Mitchell v. Dialysis Clinic, Inc., 18 Fed.App. 349, 353 (6th Cir. 2001) (citing Killian v. Healthsource Provident Admin., Inc., 152 F.3d 514, 520 (6th Cir. 1998). When it is possible

---

[1] Plaintiff filed a Motion to Permit Discovery as to whether the policy of insurance was amended after the effective date of the OFIS Regulation. On the grounds stated above, as well as a procedural ground not pertinent here, I denied the Motion in a written Order on March 15, 2010. (Docket Entry 32). My order was not appealed.

to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious. Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir. 2000). Furthermore, where there are two reasonable interpretations of the Plan, the court cannot reverse the Administrator's determination. Anderson v. Emmerson Elec. Co., 351 F.Supp. 2nd 740, 743-44 (W.D. Mich. 2004) (citations omitted); Aff'd, Anderson v. Emmerson Elec. Co., 161 Fed.App. 504, 2005 Fed.App. 1012 N (6th Cir. December 23, 2005). Nonetheless, the highly deferential standard of review does not automatically mandate adherence to [the Administrator's] decision. MacDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003).

Defendant asserts that the administrative record supports its decision to pay benefits to Plaintiff at the Group 1, rather than the Group 2 level. The policy defines the groups as follows:

> Group 1
>
> All full-time Salaried employees with Basic Annual Earnings of less than $30,000 in active employment in the United States with Employer.
>
> Group 2
>
> All full-time Salaried employees with Basic Annual Earnings of at least $30,000 but less than $40,000 in active employment in the United States with the Employer.

B@G-LIFE-1 and B@G-AD&D-1.

The policy contains no specific definition for the term "Basic Annual Earnings," but defines "Annual Earnings" as follows:

> "Annual Earnings" means your gross annual income from your Employer in effect just prior to the date of loss. It includes your total income before taxes. It is prior to any deductions made

> for pre-tax contributions to a qualified Deferred Compensation
> Plan, Section 125 Plan, or flexible spending account. It does
> not include income received from commissions, bonuses,
> overtime pay, any other extra compensation or income
> received from sources other than your Employer.

Policy, p. LIFE-BEN-1 and AD&D-BEN-2.

The glossary section of the policy, applicable to both life insurance and AD&D insurance, provides that:

> ANNUAL EARNINGS means your annual income received
> from your Employer as defined in the plan.

Policy, p. GLOSSARY-1.

Defendant correctly observes that the Notice of Claim form submitted by Absopure to Unum for benefits due as a consequence of Lowe's death listed his earnings as $1,150.00 biweekly. A typical year contains 26 biweekly paydays which, at Lowe's salary rate, would yield an income of $29,900.00. Both the Notice of Claim (CL at 17) and the cover letter from the employer (CL at 15) stated that the benefits payable under the policy were $30,000.00 in life insurance benefits and $60,000.00 in AD&D benefits, the amounts corresponding to a Group 1 level employee. Indeed, Plaintiff's January 2007 correspondence to Unum expressly requested payment of $30,000.00 and $60,000.00 for life and AD&D benefits respectively. (CL at 107). Upon receipt of the $30,000.00 in life insurance benefits in February 2007, Plaintiff made no complaint as to the correctness of the amount. Furthermore, in his appeal of the initial denial of AD&D benefits, Plaintiff, through his attorney, again expressly requested payment of $60,000.00 in AD&D benefits, the amount corresponding to a Group 1 employee. (CL at 233). When Unum granted the appeal and paid the $60,000.00 requested, Plaintiff made no objection regarding the amount.

12

It was not until July 31, 2008 that Plaintiff's counsel first raised the argument that the decedent was entitled to Group 2 status under the terms of the insurance contract. The argument was made in a letter to Ms. Tracey McKenzie, of Unum's Group Life/Special Risk Benefits Group. (UACL 00325).

Upon receipt of Plaintiff's new claim, Defendant reviewed Mr. Lowe's pay records for the period from August 2005 through September 2006. (CL at 373-412). The records were reviewed by Unum's Financial Consulting Team, which concluded that the previous $29,900.00 annual earnings calculation was correct. (CL at 413). Unum consulted with Absopure to determine if anything in Mr. Lowe's personnel file indicated that his annual earnings were other than $29,900.00. The employer responded that no such information appeared in the file, and confirmed that it was paying premiums based upon the benefit level that was actually paid. (CL at 420). Unum thereupon obtained and examined Mr. Lowe's entire personnel record, confirming for itself his employer's conclusion that it contained no information indicating that Lowe's annual earnings were other than $29,900.00. Unum determined that decedent was a Group 1 employee, and that Plaintiff's application for Group 2 benefits was without merit.

Plaintiff challenges the Plan Administrator's decision, contending that it was not the result of a reasoned analysis, and that it is inconsistent with the language of the Unum Plan and with basic principles of contract interpretation. Plaintiff assigns two primary errors. First, he asserts that employer contributions to Mr. Lowe's employee health savings account should have been included in the computation of his annual income. Second, Plaintiff argues that the Plan Administrator's computation of Lowe's annual income on the basis of 26 biweekly pay periods, rather than on a 365 day year, was incorrect. Plaintiff

contends that each of the alleged inaccuracies was clearly erroneous. Finally, Plaintiff maintains that the Plan Administrator's decision to deny Group 2 benefits constituted self interested decision making arising out of a clear conflict of interest.

### 1.    Employer Contributions to HSA

Plaintiff contends that the biweekly payments by PlastiPak of $12.50 to the decedent's Health Savings Account ("HSA") for the year preceding his death should have been treated by the Plan Administrator as part of his "Annual Earnings." The Plan defines "Annual Earnings" as "gross annual income from your employer in effect just prior to the date of loss," and states that "it includes your total income before taxes." Accordingly, Plaintiff maintains that, because the employer contributions are part of the "total" income paid to the employee before taxes, and because the Internal Revenue Code treats HSA accounts as part of gross income, the employer contributions should have been included by the Plan Administrator in computing Lowe's "Annual Earnings."

Defendant argues in response that the Plan definition of "Annual Earnings" specifically excludes several categories of monetary receipts which are part of gross income as defined in the Tax Code. The Plan expressly states that Annual Earnings "does not include income received from commissions, bonuses, overtime pay, any other extra compensation or income received from sources other than your employer." Participation in an HSA is not mandatory. Rather, an employee must affirmatively elect to contribute to such an account in order to qualify for corresponding contributions by the employer. Because the company's contributions are in addition to the employee's salary, Unum determined that they are "extra compensation," and thus excluded from the Plan definition of "Annual Earnings." That interpretation is consistent with the Plan language.

14

It should further be observed that the central criterion for assignment to insurance benefit levels under the Plan is not "Annual Earnings," but "Basic Annual Earnings." (B@G-Life-1and B@G-AD&D-1). Unfortunately, that term is not expressly defined in the Plan. Nonetheless, it is clearly a different formulation from "Annual Earnings," and the addition of the word "basic" should not be ignored. The accepted definition of the term "basic" includes "1: of, relating to, or forming the base or essence: FUNDAMENTAL, ESSENTIAL, IRREDUCIBLE . . . 2: constituting or serving as the basis or starting point . . .." Webster's Third New International Dictionary 181 (1993). In my view, applying that meaning to the word in the context of the term "Basic Annual Earnings" lends credence to the Plan Administrator's determination that employer contributions to a voluntary Health Savings Plan, though taxable, are not to be considered in assigning an employee to a group for purposes of life insurance benefits under the Plan.

Plaintiff suggests that the absence of punctuation in the final thirteen words of the Plan definition of "Annual Earnings" indicates that the term "other extra compensation" actually refers to income received from sources "other than your employer." I disagree. The terms "income received from commissions," "bonuses," "overtime pay," and "any other extra compensation," are separated by commas, indicating their individual status. While no punctuation separates the terms "any other extra compensation" and "income received from sources other than your employer," a separation is supplied by the conjunction "or," which serves the function of indicating an alternative between different or unlike things. In my view, the Plan Administrator's reading of the words in question represents a natural and sensible interpretation. While Plaintiff correctly observes that ambiguities in contract language are to be construed against the drafter, I am not persuaded that his proffered

15

interpretation of the Plan language creates an ambiguity.  Not only am I satisfied that the Plan Administrator's interpretation is more consistent with the language used, I note that the conduct of both parties to the Plan (Absopure and Unum) acted in accordance with that interpretation.  Absopure paid premiums and submitted a claim with the understanding that Lowe was a Group 1 employee. Unum accepted the premiums and paid benefits in a manner consistent with the identical interpretation. Indeed, Plaintiff himself, through his counsel, founded his initial claim for benefits on the view that Lowe was a Group 1 worker.

### 2.    **Computation of "Annual Earnings"**

Plaintiff maintains that no reasoned or principled basis exists for the computation method selected by the Plan Administrator in determining the decedent's "Annual Earnings." Plaintiff correctly observes that the method of computation called for by the Plan retrospectively projects the decedent's salary at the time of death for the annual period prior to the date of loss.  The parties agree that the period for which the earnings must be computed in this case runs from September 8, 2005 through September 7, 2006, a period of 365 days.  During that time, PlastiPak issued 26 paychecks to the decedent.  Had Mr. Lowe's final salary rate of $1,150.00 every two weeks been in effect throughout the annual period, his total salary received would have been $29,900.00.   Plaintiff argues that a computation based solely upon 26 biweekly pay intervals accounts for only 364 days and, thus, understates the decedent's annual earnings.

Defendant responds that Plaintiff's position is inconsistent with the policy language. Unum notes that the contract glossary defines annual earnings as annual income "**received**" from the employer as defined in the Plan.  (Policy, GLOSSARY-1).  Mr. Lowe's pay records confirm that he received 26 biweekly salary checks during the 365 day year

preceding his demise. At Lowe's final salary level of $1,150.00 per pay period, those 26

checks would have totaled $29,900.00. Thus, while 26 two week periods account for only

364 days, it is also true that Mr. Lowe would not have "received" payment for the 365ᵗʰ day

during the annual period prior to his death. Defendant emphasizes that Absopure confirmed

decedent's annual income to be $29,900.00 for purposes of death benefits under the Plan.

That amount corresponds to employee Group 1. While it is mathematically possible that an

employee on a two week salary interval could receive 27 checks during a calendar year,

such a circumstance would be atypical, and it is beyond dispute that Plaintiff's decedent

actually received only 26 checks during the annual period at issue in this case. Thus, I am

satisfied that a rational basis existed for the Plan Administrator's (and employer's) wage

computation.

Plaintiff emphasizes that, under Michigan law, insurance policy terms are to be

interpreted using their commonly understood meaning. See Ososki v. St. Paul Surplus

Lines, 156 F.Supp. 3ʳᵈ 714 (E.D. Mich. 1999), Henderson v. State Fare Fire and Cas. Co.,

460 Mich. 348, 356-57 (1999) (all non-technical words and phrases to be defined according

to the common and approved usage of the language). MCL 5.3a; MSA 2.212(1).

> Employing this analysis, the word "annual" means "of or
> pertaining to a year, determined by a years time. See, the
> American Heritage Dictionary, (2d Ed., p. 402). In the same
> dictionary, the word "year" is defined as "comprehending . . .
> the twelve calendar months, or 365 days from January 1 to
> December 31" (p. 969). Similarly, the American Heritage
> Dictionary defines "year" as "consisting of 365 days . . ..

(Plaintiff's Brief, Docket No. 21, pps. 13-14).

Even assuming that the application of the decedent's final wage rate for the entire

365 day annual period preceding his death is an appropriate method of calculating his basic

annual earnings for purposes of determining death benefits under the Plan, the result would be the same. Plaintiff himself offered this method as a reasoned and principled approach.[2] The decedent's salary of $1,150.00 every two weeks corresponds to a weekly payment of $575.00. A commonly understood year of 365 days amounts to 52.1428 weeks. Multiplying $575.00 by that number yields an annual earnings of $29,982.14, which still corresponds with Employee Group 1.

Plaintiff next attempts to achieve Employee Group 2 status for the decedent by offering the opinion of Barry Grant, a CPA. Mr. Grant calculated Lowe's annual earnings through the use of an IRS approved 27 year calendar cycle which derives a constant number of weeks in a business year by averaging three standard 365 day years with a fourth (leap) year of 366 days. Multiplying the resulting average weeks per year by Lowe's final salary rate of $575.00 per week yields an annualized salary of $30,015.00. Nothing in the Employee Benefit Plan, however, obliges the Administrator to employ a 27 year calendar cycle in determining an employee's benefits classification. On the contrary, Plaintiff concedes that the relevant period for computing Mr. Lowe's annual earnings for purposes of a death benefit was September 8, 2005 through September 7, 2006. It is an historical fact that the relevant period consisted of 365 days, and no averaging is necessary to determine the correct number of weeks involved. While the 27 year cycle is accepted by the government for purposes of tax accounting over a period of business years, the averaged

---

[2]  Plaintiff offered this argument under the mistaken factual impression that the year preceding Lowe's death was a leap year (366 days) requiring the inclusion of an extra day's salary in the annual earnings computation. He subsequently acknowledged that error in a Reply Brief, conceding that the year at issue in this case was comprised of 365 days.

weeks/year factor does not accurately correspond to either a single 365 day year or a single 366 day leap year. Nor can it be reasonably concluded that the 27 year cycle approach corresponds with the common and approved usage of the words "annual" or "year," as explained by Plaintiff himself in his brief. It is simply an IRS approved accounting tool.

Plaintiff's accountant offered an alternative calculation of decedent's annual earnings during the period September 8, 2005 to September 7, 2006. That calculation is based upon the assumption that the relevant period consisted of 52.2 workweeks. Multiplying that figure times Lowe's final weekly salary rate of $575.00 yielded an annual salary of $30,015.00. Unfortunately, Mr. Grant's assumption as to the number of weeks in the relevant period is inaccurate. The 365 day period from September 8, 2005 to September 7, 2006 consisted of 52.1428 weeks ($365 \div 7 = 52.1428$). Multiplying that figure times Mr. Lowe's final salary rate of $575.00 per week yields an annual earnings figure of only $29,982.14, corresponding to Employee Group 1.

Finally, Plaintiff attempts to qualify the decedent for Employee Group 2 benefits by calculating an average daily pay rate using only working days (presumably weekdays) and not overtime days (presumably weekends). Using that method, Plaintiff contends that Mr. Lowe's correct daily salary rate should be $115.00 ($1,150.00 \div 2 = $575.00 \div 5 = $115.00$). By adding that daily amount (representing the 365[th] day of the annual period) to the 26 biweekly payments of $1,150.00, Plaintiff maintains that the decedent should have been classified in Employee Group 2. Nothing in the Employee Benefit Plan, however, calls for such a method of computation. Absopure established Lowe's final salary at $1,150.00 every two weeks. Further, Plaintiff offers no evidence or persuasive argument that common understanding and usage of the terms "week" or "biweekly" correspond to periods of time

other than 7 days and 14 days, respectively.

Even if the Plaintiff's various alternative analyses were fully consistent with the language of the Plan in light of the commonly accepted interpretation of the language used, affirmance of the Plan Administrator is appropriate because its calculations are also fully consistent with common understanding of the language in the contract.

> The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir. 2000). If an administrator's decision on eligibility for benefits is "rational in light of the plan's provisions," it is not arbitrary or capricious. Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988) (citations omitted), cert. denied, 488 U.S. 826, 109 S.Ct. 76 (1988). When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious. Williams, 227 F.3d at 712. Furthermore, where there are two reasonable interpretations of the plan, the court cannot reverse the administrator's determination. Anderson v. Emerson Elec. Co., 351 F.Supp. 2nd 740, 743-44 (W.D. Mich. 2004) (citations omitted), aff'd Anderson v. Emerson Elec. Co., No. 05-1036, 161 Fed. App. 504, 2005 Fed. App. 1012 N (6th Cir. Dec. 23, 2005).

Bailey v. Ford Motor Company, 2006 WL 2620279 (E.D. Mich.).

Plaintiff's final challenge to the Plan Administrator's decision is premised upon the statutory obligation to discharge its duties in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries of the Plan." 29 U.S.C. §1104(a)(1). ERISA further requires that administrator's provide a full and fair review of claim denials. 29 U.S.C. §1133(2). When a single insurer acts in the dual capacities of determining a claimant's eligibility and paying any benefits award, the law recognizes an inherent conflict of interest. See, Kalish v. Liberty Mutual/Liberty Assur. Co., 419 F.3d 501, 506 (6th Cir. 2005); Giamondi v. United Tasks Corp., 408 F.3d 295, 298 (6th Cir. 2005).

Courts have identified circumstances indicating that an insurer/administrator's denial of benefits will reflect self-interest. Plaintiff correctly observes that a significant disparity between the benefits payable under different coverages may create an inference of self-interested decision making. <u>Kufner v. Jefferson Pilot Financial Ins.</u>, 595 F.Supp. 2nd 785 (W.D. Mich. 2009). The absence of evidence that a claimant's proofs were assessed by independent sources may also give rise to such an inference. See, <u>Culvert v. Firstar Financial, Inc.</u>, 409 F.3d 286, 295 (6th Cir. 2005).

In response, Unum asserts that the inherent conflict of interest created by its dual status as administrator/insurer does not change the standard of review. Rather, the conflict is simply a factor to be considered in determining whether the insurer abused its discretion in denying a claim. <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343 (2008).

> We turn to the question of "how" the conflict we have just identified should "be taken into account on judicial review of a discretionary benefit determination." 552 U.S. ___, 128 S.Ct. 117 (2008). In doing so, we elucidate what this court set forth in <u>Firestone</u>, namely, that a conflict should "be weighed as a 'factor in determining whether there is an abuse of discretion.'"
>
> 489 U.S. at 115, 109 S.Ct. 948 (quoting Restatement §187, comment d; alteration omitted).
>
> We do not believe that <u>Firestone's</u> statement implies a change in the *standard* of review, say from deferential to *de novo* review. Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion. See Restatement §187, comments d-j, id., §107, comment f, Scott section 18.2, at 1342-1344. We see no reason to forsake <u>Firestone's</u> reliance upon trust law in this respect.

<u>Glenn</u>, 128 S.Ct. at 2350.

While Plaintiff here identifies the conflict, he does not offer any evidence that it was a factor in Unum's decision to deny payment of Group 2 benefits in this case. Defendant points to the following facts as evidence that it was not influenced by the inherent conflict in rendering its benefits decisions in this case: 1) The notice of claim form submitted by the employer to Unum reported Lowe's earnings as $1,150.00 biweekly, amounting to annual earnings of $29,900.00 during the 365 day period at issue in this case. (CL at 17). 2) Both the Notice of Claim and the cover letter from the employer reflected that benefits payable under the policy should be those corresponding to Employee Group 1. (CL at 15, 17). 3) Plaintiff's January 2000 correspondence to Unum also explicitly requested payment of benefits at Employee Group 1 levels. (CL at 107). 4) Plaintiff's appeal from the initial denial of AD&D Benefits again explicitly sought payment of AD&D Benefits payable at the Employee Group 1 level. (CL at 233). 5) Upon receiving Plaintiff's claim for Group 2 benefits, Unum confirmed with Absopure that there was "nothing" in Mr. Lowe's file to indicate that his annual earnings were other than $29,900.00. (CL at 420). 6) The employer also confirmed that it had been paying premiums for Mr. Lowe's coverage based upon his status as a Group 1 employee. (CL at 420). 7) Unum requested and obtained Mr. Lowe's pay records for the time period from August 2005 through September 2006 (CL at 375-412), and its financial consulting team reviewed those records to assure itself that the annual earnings level reported by the employer was accurate. (CL at 413). 8) Unum further reviewed Lowe's entire personnel file (CL at 467-511) and determined that it contained no evidence indicating annual earnings in excess of the $29,900.00 reported by Absopure. It might further be noted that, after initially denying AD&D Benefits, based upon medical evidence suggesting intoxication as a factor in Lowe's death, Unum fairly reviewed the

evidence presented by Plaintiff on appeal and reversed its initial decision. Based upon the parties respective submissions, I am satisfied that the inherent conflict of interest has not been shown to have had an effect upon Unum's benefits determinations. I find it especially persuasive that both parties to the policy of insurance have interpreted its terms in the same way, and that Plaintiff also accepted the reasonableness of that interpretation until long after the Group 1 benefits were paid.

In conclusion, having examined the administrative record in light of the parties arguments, I am satisfied that Unum's determinations regarding the appropriate benefits payable in this case easily withstand scrutiny under an arbitrary and capricious standard of review. I suspect that Plaintiff's persistent efforts to impose the less deferential de novo standard is a tacit admission of that fact. Even under a de novo standard, I would have recommended affirmance in this case. In its original benefits decision, and in its denial of Plaintiff's renewed claim in 2008, Defendant rendered a principled decision supported by substantial evidence. I recommend that Plaintiff's Motion for Summary Judgment be denied, and that Defendant's Motion for Summary Judgment be granted.

III.    **NOTICE TO PARTIES REGARDING OBJECTIONS**:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have

to this Report and Recommendation.  <u>Smith v. Detroit Federation of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987), <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Donald A. Scheer
DONALD A. SCHEER
UNITED STATES MAGISTRATE JUDGE

DATED: June 14, 2010

_____

**CERTIFICATE OF SERVICE**

I hereby certify on June 14, 2010 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on June 14, 2010: **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge Donald A. Scheer
(313) 234-5217